UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIZONA MOORE,                          )
                                        )
                Plaintiff,              )    Case. No. 11 C 1351
        v.                              )
                                        )    Magistrate Judge Arlander Keys
MICHAEL J. ASTRUE,                      )
Commissioner of Social                  )
Security,                               )
                Defendant.              )

## MEMORANDUM OPINION AND ORDER

On April 24, 2006, Arizona Moore filed an application for
Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI"), claiming that he had been disabled since April 1,
2004 due to back pain resulting from a previous gunshot injury
and from depression, which was caused by his pain. His requests
for both DIB and SSI were denied on November 17, 2006. Record at
81-84. On January 4, 2007, he filed a request for
reconsideration, which was denied on February 13, 2007. Record
at 90-93, 94-101. On March 13, 2007, he requested a hearing
before an administrative law judge. ALJ Percival Harmon held the
hearing in Chicago, Illinois, on February 10, 2009. Mr. Moore
appeared, represented by counsel, and testified. The ALJ also
heard testimony from Mr. Moore's fiancé, a Vocational Expert, and
a Medical Expert.

Mr. Moore, who was 52 years of age at the time of the
hearing, testified that he is about 5'7", weighs 150 pounds, and

is right-handed. Record at 28, 34. He testified that he is a high school graduate and attended college for a period of about one year. Record at 28. He testified that he did not receive a college degree. Record at 28. He testified that he lives in a first floor apartment with his fiancé and her 14-year-old son. Record at 29, 42-43. He testified that he was incarcerated on a drug possession charge for 61 days beginning in July 2007 and ending in September 2007. Record at 29. When the ALJ questioned Mr. Moore regarding his drug use, he testified that he had completed a methadone program in 2003 and no longer uses drugs. Record at 38. He testified that he does drink socially. Record at 39.

With regard to his work history, Mr. Moore testified that he last worked full time in 2003, as a union roofer for Ross Sheet Metal. Record at 30. He testified that this job required him to regularly lift one hundred pound rolls, as well as to lift and climb up and down ladders. Record at 31. He testified that, prior to that, he worked at the University of Illinois hospital. Record at 29. Mr. Moore testified that since he stopped working full time, he worked in June 2008 as a roofing guard for three weeks. Record at 33-34. This job required him to stand on the ground and warn workers on the roof if they were dangerously close to the edge. Record at 34. He testified that, prior to that, he was paid for four weeks in 2007 to sit on the strike

line by the United Brotherhood of Carpenters & Jointers of America. Record at 32.

Mr. Moore testified that, in 1987, he suffered a single gunshot wound that damaged his lung, liver, and kidney. Record at 36-37. He testified that fragments from the bullet remain in his body and have caused progressively worsening pain in his lower back and right leg. Record at 37. He testified that he can no longer walk down ladders or carry roofing materials. Record at 38. Additionally, Mr. Moore testified that he has experienced episodes of depression since the shooting. Record at 38, 45. He also testified that he sometimes gets pain in his chest, and that it is sometimes hard for him to breathe. Record at 50.

With regard to his medications, Mr. Moore testified that, at the time of the hearing, he was taking Prozac, Ibuprofen, Risperdal, and Trazodone. Record at 40-41. He testified that he takes ibuprofen twice a day for pain, and the ibuprofen effectively stops the pain for "a good couple of hours." Record at 49. Mr. Moore testified that his medications cause drowsiness. Record at 42.

With regard to his daily activities, Mr. Moore testified that he has allowed his driver's license to expire, but that he can sometimes take public transportation. Record at 39. He testified that he cooks sometimes, and cleans the kitchen

occasionally. Record at 39-40. He testified that he performs no exercises or therapy for his back or neck. Record at 39-40. He testified that he is able to grocery shop, but that his fiancé usually accompanies him because he forgets items. Record at 40. He testified that he is home alone during the day. Record at 45. He testified that, during the day, he watches TV, DVDs, and reads real estate books. Record at 45-46. He testified that, while he used to go out to eat and go to the movies with his fiancé, they do not go out any longer. Record at 45.

With regard to his physical limitations, Mr. Moore testified that he is able to walk 2-3 blocks with the assistance of his cane before pain stops him. Record at 46. He testified that a nurse at Stroger Hospital gave him a cane in December 2008 because of "the way [he] was walking." Record at 44. He testified that he uses the cane when he needs to walk farther distances, as well as when he is around the house. Record at 44-45. When the ALJ asked him how long he could stand without the cane, he testified that he can stand for 5 minutes without assistance. Record at 46-47. The ALJ then asked him how long he could sit without getting up; he answered, "About ten minutes." Record at 47. The ALJ commented that he had been sitting for longer than ten minutes at that point in the hearing. Record at 47. Mr. Moore then testified that, as long as he is able to move his right leg, he could sit for 30 minutes. Record at 47. He

testified that he could lift about ten pounds and regularly lifts grocery bags at home. Record at 48. He testified that he can dress and undress himself without assistance, can put on shoes, and can reach above his head to a kitchen or closet shelf at home. Record at 48.

With regard to his mental limitations, Mr. Moore testified that he feels depressed, "all the time", but that he has no anxiety or anxiousness. Record at 45. When Mr. Moore's counsel asked him if he ever heard voices, Mr. Moore answered that he did. Record at 49-50. He testified that the voices started about two to three years ago, he hears them about twice a day, and they say "names". Record at 50. He also testified that he has seen things that are not there "maybe twice". Record at 50.

Mr. Moore also testified that he has trouble sleeping. Record at 43. He testified that he typically lays down for the night at 9 p.m., falls asleep around 3 a.m., and wakes at 6 a.m. Record at 43. He further testified that his frustration from being unable to work contributes to his inability to sleep. Record at 43-44.

With regard to his personal relationships, Mr. Moore testified that he has been with his fiancé thirteen or fourteen years and that they have a good relationship. Record at 48. He testified that he also has a good relationship with her 14-year-old son, who lives with them. Record at 48. When the ALJ asked

him if he had good friends that he kept in touch with, he answered that he did not. Record at 45.

The ALJ also heard testimony from Felicia Beauford, Mr. Moore's fiancé. Ms. Beauford testified that she was 48 years of age at the time of the hearing and employed at the City of Chicago Health Department. Record at 52. She testified that she has lived with Mr. Moore for thirteen years. She also testified that she came to the hearing because she was concerned about Mr. Moore traveling alone, especially being able to find the hearing location. Record at 53-54. She testified that on the way, they took public transportation, but that after they got off the EL, Mr. Moore asked her to stop and rest every half a block because he was tired from walking. Record at 53.

With regard to their daily life, Ms. Beauford testified that Mr. Moore is able to do dishes, make the bed, and sometimes mop the floors. Record at 54, 58. She testified that Mr. Moore has used his cane "since the end of last year". Record at 57. She testified that they go out to eat but rarely go to the movies. Record at 57. When the ALJ asked whether Mr. Moore was able to travel alone, Ms. Beauford testified that he knew his surrounding areas and was able to walk half a block to meet her son on his way home from school. Record at 56. She testified that she helps him take his medications so that he gets the proper dosage. Record at 57. She testified that, when she can, she accompanies

6

Mr. Moore on his visits to the doctor, and when she cannot, he either goes alone or possibly asks his brother to accompany him. Record at 55. She also testified that most nights he is unable to sleep through the night, and that she hears him get up and move around; sometimes he asks if someone is there. Record at 55.

During Ms. Beauford's testimony, there was confusion regarding the timing and nature of the voices that Mr. Moore testified he heard. When first asked by Mr. Moore's counsel about the voices, Ms. Beauford testified that she thought Mr. Moore heard voices "two or more times in a day" when awake. Record at 55. She was unsure if he saw hallucinations accompanying the voices. Record at 55. However, when the ALJ asked if Mr. Moore heard voices, she answered, "The way he comes out of his sleep, I think he hears something… Sometimes it's like responding to something, you know, who is that, it's always who is it, who is that." Record at 57-58. On reexamination, when Mr. Moore's attorney asked whether "he sees things that aren't there when you're watching TV", she replied that he misunderstood her meaning. Record at 58. She further testified that "sometimes like he'll see something pass the room, he'll think he's seeing something pass the doorway or something", but suggested that he could be reacting to her son moving around the house. Record at 58-59.

The ALJ next heard from Dr. Robert Marquis, a Medical Expert. The ME testified that, based on his review of the medical records, he believed that Mr. Moore had been diagnosed as having anxiety and mood disorders, but he was unable to determine the reasons for those diagnoses. Record at 60. With regard to the hallucinations, the ME testified that there was little to suggest that Mr. Moore was experiencing these psychotic phenomena during the day. Record at 60. He testified that these could be related to post traumatic stress disorder, but noted that Mr. Moore was not undergoing treatment for his hallucinations. Record at 60. The ME testified that he saw no psychological testing or any demonstration of organic symptoms to support a diagnosis of PTSD in the medical records. Record at 61.

At this point, Mr. Moore's attorney interjected that he was attempting to obtain Mr. Moore's records from Stroger Hospital, but had thus far been unsuccessful. Record at 61. The ALJ then asked Mr. Moore if he had been receiving psychiatric treatment in the last year; Mr. Moore replied that he sees the psychiatrist at Stroger whenever he refills his medications, which is about every three months. Record at 61-62. The ALJ took copies of counsel's requests for medical records and asked that those medical records be admitted in the record once obtained. Record at 63.

The ALJ then asked the ME whether he found that Mr. Moore's depression was established as a severe impairment; he testified

that he did not. Record at 63-64. The ME also testified that Mr. Moore's possible post-traumatic stress disorder was not established as a severe impairment. Record at 64-65. The ME also indicated that Mr. Moore's past history of substance abuse may have effected a 12.08 claim, but he could not be sure. Record at 64.

With regard to Mr. Moore's capacity to work, the ME testified that he believed Mr. Moore could perform unskilled repetitive work, though he testified that he did not have enough material to determine whether Mr. Moore could sustain a normal pace of work. Record at 65-66. He testified that Mr. Moore may have memory impairment, but that he did not have enough information in the medical record to determine whether this was the case. Record at 68. He testified that, if Mr. Moore did have recurrent and intrusive recollection of a traumatic experience, it may or may not affect his ability to work, but that there was not enough information in the record for him to establish an opinion in Mr. Moore's case. Record at 69.

With regard to Mr. Moore's medications, the ME testified that Trazodone is an anti-depressant that in practice is used to treat insomnia. Record at 71. The ME testified that Risperdal is a "major tranquilizer", and that he did not know why it would be prescribed for sleep. Record at 71.

Finally, the ALJ heard testimony from Grace Gianforte, a Vocational Expert. She testified that Mr. Moore's past work was characterized as a roofer, classified at SVP:5 and skilled and heavy exertion by the Department of Labor. Record at 72. After noting Mr. Moore's advancing age, high school education, and no transferrable skills, the ALJ asked the VE what work she could identify for a hypothetical individual with the following restrictions: occasionally lift 50 pounds, frequently 25, could sit for 6 of 8 hours with breaks, stand and walk 6 hours in an 8-hour day, or up to 6 hours in an 8-hour day with breaks, with occasional climbing of stairs and ramps, ladders, ropes, scaffolding, stooping, squatting, crouching, kneeling, crawling, balancing; she testified that an individual with those restrictions could work as a packer, production helper, or kitchen helper. Record at 73. The ALJ then asked if the restrictions were changed so that the individual could occasionally lift just 20 pounds, frequently lift and carry 10 pounds, with the sitting and standing restrictions remaining the same, what work would be available; she testified that the individual could work as a coin operated laundry attendant, school bus monitor, or electrical assembler. Record at 72-73. The ALJ then asked what work would be available if the individual were limited to the sedentary level; she testified that the hypothetical individual could find work in the electronics

industry, and in the optics industry. Record at 74-75. Finally, the ALJ asked how a severe mental limitation causing both a marked limitation in ability to perform a normal work day and work week without interruption, and an inability to perform at a consistent pace without an unreasonable number and length of rest breaks would affect the hypothetical individual; she testified that there would be no work a person having these adverse factors could perform. Record at 75. The ALJ asked the VE whether her testimony was consistent with the DOT, and she testified that it was.

Mr. Moore's attorney then asked the VE whether an individual using a cane could perform work in the medium and light categories discussed; she testified that she did not consider a cane in any of the ALJ's hypotheticals. Record at 76. She further testified that an individual using a cane would be precluded from medium work, light work, and all sedentary jobs working in an industrial environment, manufacturing environment, or distribution center. Record at 77. The ALJ then asked what sedentary jobs would be available to an individual using a cane; the VE testified that routine, unskilled repetitive work would be available, such as a mail sorter or document preparer. Record at 77. She further testified that the individual would most likely be precluded from clerical work, which requires a certain level of alertness and focus, as well as more of a learning curve than

work in industrial and manufacturing environments.  Record at 78.

At the end of the hearing, the ALJ agreed to hold the record open to give Mr. Moore and his attorney time to supplement the record with any additional medical records.  The ALJ stated that he would make a request for the progress records from Stroger Hospital, beginning in January 2007.  Record at 79.

During the period from February 3, 2009 to August 3, 2009, the ALJ was apparently unable to obtain these additional records from Stroger Hospital.  However, Mr. Moore was able to obtain them after the ALJ rendered his decision.  These records show the plaintiff made additional visits to Stroger Hospital and Fantus Psychiatry clinic during the period from October 2007 to April 2010.  The Appeals Council entered them into the record on January 6, 2011.

The records that were before the ALJ show that, on July 7, 1999, Mr. Moore was treated at Michael Reese Hospital for abdominal pain and penile bleeding.  Record at 356-62.  He did not complain of any mental disturbances at this time.

On June 5, 2006, Mr. Moore visited the Emergency Department at Provident Hospital of Cook County complaining of chest pains that had been ongoing for 3 months, worsening in the past 2 months.  Record at 270.  Mr. Moore was diagnosed with chronic pain from a previous gunshot wound, as well as atypical chest pain.  Record at 269.  He had no abnormal findings on

chest/respiratory, extremities, musculoskeletal, and neurological exams. Record a 277. Chest x-rays showed metal foreign bodies projecting over the spine, mild hyperinflation, minimal prominence with atherosclerotic calcification over the aorta, and interstitial density at the right lung base consistent with scarring. Record at 284.

On October 16, 2006, Mr. Moore saw Dr. Peter Biale during a consultative examination for the Bureau of Disability Determination Services. Record at 287. Mr. Moore stated that he suffered a gunshot wound to his abdomen "a few years ago" that affected his liver, lung, and kidney. Record at 287. He complained of pain in his back, especially when bending, lifting, walking, and climbing. Record at 287. Mr. Moore also described having depression and flashbacks to the accident, as well as difficulty sleeping. Record at 287. He also claimed some memory loss. Record at 287. He indicated that he was on no medications at that time. Record at 287.

Also on October 16, 2006, Mr. Moore saw Dr. Mahesh Shah for a radiological examination for the Bureau of Disability Determination Services. Record at 291. Dr. Shah noted that x-rays showed diminished intervertebral space between L4-L5 levels. Record at 291. His impression was degenerative disc disease between L4-L5 and L5-S1 levels. Record at 291.

On October 31, 2006, Mr. Moore saw Dr. John W. O'Donnell for a psychiatric evaluation for the Bureau of Disability Determination Services. Record at 292. Mr. Moore told Dr. O'Donnell that he was shot "about eight years ago". Record at 292. When asked how his injuries affected him now, Mr. Moore told Dr. O'Donnell that he could not bend and that he could not work construction anymore. Record at 292. He reported taking two Tylenol III a day for the pain. Record at 292, 293. With regard to his insomnia, Mr. Moore complained of falling asleep at 4 a.m., waking at 5 a.m., thus sleeping only an hour at a time. Record at 294. When asked about his mood, Mr. Moore said that he felt "sad". Record at 295. Dr. O'Donnell noted that Mr. Moore's affective status varied from being socially appropriate to being mildly flattened during this conversation, but that this was "congruous with thought content". Record at 295. When asked about his depression, Mr. Moore said that he was depressed about his gunshot wound and pain, as well as his inability to work. Record at 295. He stated that he was depressed every day, all day; and has been since finding that he could not work. Record at 295. Mr. Moore also described hallucinations to Dr. O'Donnell, saying that he hears "a male voice, just talking to him, saying all kinds of things." Record at 296. He denied any visual hallucinations, but noted that he has seen shadows since the shooting. Record at 296. Dr. O'Donnell also noted Mr.

Moore's "vague paranoid ideation", nightmares of the shooting, and flashbacks during the day. Record at 296. Dr. O'Donnell also performed some memory exercises with Mr. Moore, however, he noted nothing out of the ordinary in his responses. Record at 296-297. Dr. O'Donnell diagnosed Mr. Moore with major depressive disorder with psychotic features, post-traumatic stress disorder, possible pain disorder with both psychological features and general medical condition. Record at 297. He diagnosed past heroin abuse and methadone dependence based on Mr. Moore's medical history, both in remission; and suspected alcohol abuse in early remission. Record at 297.

On November 7, 2006, a non-examining Medical Consultant, Dr. Frank Jiminez, completed a physical RFC assessment form. Record at 299. With regard to Mr. Moore's physical limitations, Dr. Jiminez opined that there were no exertional limitations, and occasional limitations on climbing, balancing, stooping, kneeling, crouching, and crawling due to secondary loss of motion and pain. Record at 300-301. Dr. Jiminez found no manipulative, visual, communicative, or environmental limitations. Record at 302-303. He indicated that Mr. Moore had limited range of motion of the lumbosacral spine, with flexion 45 degrees, extension 10 degrees, lateral flexion right and left 10 degrees with tenderness in paraspinal muscles. Record at 306. He also noted some sensory deficit in the right lower extremity. Record at

306.

On November 16, 2006, Dr. Carl Hermsmeyer completed a
Psychiatric Review Technique form for Mr. Moore covering the date
of assessment.  According to Dr. Hermsmeyer, Mr. Moore suffered
from 12.02 Organic Mental Disorders, including "perceptual or
thinking disturbances" and "disturbance in mood"; "major
depressive disorder with psychotic features"; 12.04 Affective
Disorders including "disturbance of mood, accompanied by a full
or partial manic or depressive syndrome" and "major depressive
disorder with psychotic features;"  12.06 Anxiety-Related
Disorders including "recurrent and intrusive recollections of a
traumatic experience, which are a source of marked distress."
Record at 307-08, 10, 12.  Dr. Hermsmeyer also found 12.09
Substance Abuse Addiction Disorders affecting his 12.02 and 12.04
symptoms.  Record at 315.  He also checked the boxes for "RFC
Assessment Necessary", and "Coexisting Nonmental Impairment(s)
that Requires Referral to Another Medical Specialty".  Record at
307.  With regard to functional limitations, Dr. Hermsmeyer
found Mr. Moore was mildly limited in his activities of daily
living, moderately limited in maintaining social functioning, and
moderately limited  in maintaining concentration, persistence, or
pace, but otherwise was not limited; he determined that he had no
episodes of decompensation.  Record at 317.  For the 12.02,
12.04, and 12.06 findings, he noted for all findings that

"evidence does not establish the presence of the "C" criterion."
Record at 318. In summary, he noted:

> The mental status exam and daily activities
> indicate the severity does not meet or equal any mental
> listing, but is more than non-severe. Although the
> claimant may have problems with understanding,
> remembering, and the ability to carry out detailed
> instructions, the claimant retains the mental capacity
> to perform simple one and two-step task at a consistent
> pace.

Record at 319.

Also on November 16, 2006, Dr. Hermsmeyer filled out a
Mental RFC Assessment on Mr. Moore for a period of current
evaluation. Dr. Hermsmeyer found that Mr. Moore's ability to
understand and remember detailed instructions was moderately
limited and that his ability to carry out detailed instructions
was moderately limited; he found that Mr. Moore was not
significantly limited in any other area of the RFC Assessment.
Record at 321-322. Again, he found that, despite his
limitations, "the claimant retains the mental capacity to perform
simple one and two-step task at a consistent pace." Record at
323.

On February 5, 2007, Dr. Glen Pittman filled out an Illinois
Request for Medical Advice form for Mr. Moore's reconsideration
determination. Dr. Pittman reviewed the medical portion of his
DI determination and affirmed the initial unskilled PTRF. Record
at 325-27.

Also on February 5, 2007, Dr. Young-Ja Kim filled out a

Physical Residual Functional Capacity Assessment on Mr. Moore. Dr. Kim found that Mr. Moore could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was not limited in his capacity to push or pull. Record at 329. He found that Mr. Moore could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. Record at 330. He found no manipulative, visual, communicative, or environmental limitations. Record at 331-32. He noted that Mr. Moore's strength level was 5/5. Record at 335.

On June 25, 2007, while in custody of the Illinois Department of Corrections at Shawnee, Mr. Moore complained of chest pains that had been bothering him for 6 weeks, with pains at a level of 6 out of 10 in severity for the past 2 weeks. Record at 340. He reported a history of heart murmur, gunshot wound to the chest, depression, and medications including Prozac and Trazodone, as well as Naproxen for back pain. Record at 339. The examiner noted his diagnostic impression as a history of depression and chest pain on the left side, and questioned whether Mr. Moore was "malingering." Record at 341. He reported no other symptoms at this time. At a follow-up appointment on July 11, 2007, Mr. Moore stated that "I have an old gunshot wound to the chest nine months ago." Record at 342. The treating physician observed that he was asymptomatic and denied being in

pain, and assessed chest wall pain and "malingering" chest wall pain. Record at 342. On July 20, 2007, he again complained of right lower back pain and leg pain, as well as right chest pain. The examiner reported no abnormal findings. He was prescribed Naproxen for pain. Record at 344.

While at Shawnee, Mr. Moore also underwent a Mental Health Evaluation on June 7, 2007. At that time, Mr. Moore claimed that he had been taking psychotropic medications for a year and a half. Record at 352. Mr. Moore indicated that he felt depressed, but gave no indication that he felt anxious or saw hallucinations. Record at 352. He denied any thoughts of harming himself or others. Record at 352. He denied alcohol or drug use. Record at 352. His provisional diagnosis was Axis 1: 311 – Depressive Disorder NOS. Record at 352. The treating physician prescribed Mr. Moore Trazodone and Prozac. Record at 351. These prescriptions were renewed throughout Mr. Moore's incarceration at Shawnee.

On August 3, 2007, Mr. Moore participated in a group therapy program at Shawnee facilitated by Harry Gilley, MSW, LCSW. Mr. Gilley observed that Mr. Moore was seeking an increase in his medication due to lack of sleep and other symptoms; he appeared to benefit from the session. Record at 354. On August 6, 2007, during his discharge evaluation, Mr. Moore's depression was again noted. Record at 348. On August 12, 2007, he received refills

for both his Prozac and Trazodone prescriptions.  Record at 349.
The report also noted that his response to counseling sessions
was "OK".  Record at 349.  He required no assistive devices to
walk at that time.  Record at 349.  Mr. Moore was referred to
Stroger Cook County Hospital for any necessary follow up.  Record
at 349.

On December 18, 2008, Mr. Moore sought treatment at the
emergency room at Stroger Hospital, complaining of lower back
pain and depression.  Record at 367.  He denied suicidal or
homicidal ideas.  Record at 367.  He was able to walk with no
weakness of the leg.  Record at 367.  At that time, he requested
a cane "because he is getting old and sometimes needs [a cane]."
Record at 367.  The diagnostic impression was lower back pain
and depression.  Record at 369.  He did not complain of any
hallucinations at this time.  Record at 367-70.

On March 4, 2009, Mr. Moore went to the Stroger emergency
room for a prescription refill.  Record at 378.  He reported a
history of gunshot wound.  Record at 378.  The notation
references a history of bipolar disorder, but does not contain a
diagnosis.  Record at 378.  He was ambulatory with a cane.
Record at 378.  Diagnostic impression was bipolar disorder, and
he received a medication refill of 1mg Risperdal, 20mg Prozac,
500mg Naproxen, and 50 mg Trazodone daily.  Record at 379.
Otherwise, he had no abnormal findings.

The ALJ issued his decision on August 3, 2009 denying Mr. Moore's claim for DIB and SSI. He determined that Mr. Moore met the insured status requirements of the Social Security Act through June 30, 2007 and that he had not engaged in substantial gainful activity since April 1, 2004. Record at 11. The ALJ determined that Mr. Moore suffered from status post gunshot wound to the back, degenerative disc disease of the lumbar spine, depression, and past history of substance abuse, but did not have an impairment or combination of impairments that met or equaled a listed impairment; he also determined that he had the Residual Functioning Capacity to perform work requiring him to occasionally lift/carry 20 pounds, lift 10 pounds frequently, sit 6 hours and stand/walk 6 hours in an 8-hour workday, occasionally climb stairs, ramps, ladders, ropes, and scaffolds, occasionally stoop, squat, crouch, kneel, crawl, and balance, and simple, routine unskilled work. Record at 12. Thus, he determined, he was unable to perform his past relevant work as a roofer, but could perform other jobs that exist in significant numbers in the national economy. Record at 18-19. Therefore, the ALJ determined, he was not disabled within the meaning of the Act, and was not entitled to benefits. Record at 19-20.

After the ALJ issued his decision, Mr. Moore submitted additional medical records, showing that he made two more visits to Stroger Hospital during 2007-2008. First, on October 9, 2007,

Mr. Moore visited the Adult Screening Clinic complaining of low back pain and depression. Record at 410. He reported no suicidal or homicidal ideations. Record at 410. His lower back pain was stable with no change in the character of the back pain. Record at 410. On physical exam, the attending physician noted paraspinal muscle tenderness, his straight leg test was negative, and he had no spinal tenderness. Record at 410. His discharge diagnoses were depression and low back pain. Record at 411. He was given a prescription for 20 mg Prozac, 50 mg Trazodone, and 500 mg Naproxen for 1 month. Record at 411.

On September 10, 2008, almost a year later, Mr. Moore again went to the Adult Screening Clinic complaining that he had been taking his medications for about one year without real benefit, and he still felt depressed. Record at 406. He mentioned suicidal thoughts, but no plan. Record at 406. He stated that he was hearing voices. Record at 408. He was diagnosed with major depressive disorder with psychotic features. Record at 407. His medication levels at that time were raised to 40 mg Prozac, 50 mg Trazodone, and 1 mg Risperdal. Record at 408.

Mr. Moore also submitted records relating to his treatment during the period of time after the ALJ's decision. On August 31, 2009, Mr. Moore visited the Adult Screening Clinic at Cook County Hospital complaining of sleep disturbance, appetite disturbance, and anxiety/mood difficulty. Record at 386. He also complained

of periodic suicidal ideation, with no prior attempts or active
suicidal ideations currently. Record at 386. He received a
diagnosis of major depressive disorder and post-traumatic stress
disorder. Record at 386. His medication levels were raised to
40mg Prozac, 100mg Trazodone, and 3mg Risperdal daily. Record at
389.

On April 19, 2010, Joseph Elsy, a Psychiatric Nurse
Practitioner at Fantus Psychiatry Clinic, forwarded a Memo to the
Appeals Council which stated that Mr. Moore's current psychiatric
diagnosis was major depression with psychotic features and post-
traumatic stress disorder. Record at 416. On this date, Mr.
Elsy raised Mr. Moore's psychiatric medication levels to 40 mg
Prozac, 150 mg Trazodone, and 4 mg Risperdal daily. Record at
416. He stated that the patient's medical and psychiatric
diagnoses and conditions interfere with his activities of daily
living and maintaining a job. Record at 416.

On November 22, 2010, Joseph Elsy, N.P. again forwarded a
Memo to the Appeals Council, confirming that Mr. Moore's
psychiatric diagnosis had not changed. Record at 417. His
medication levels also had not changed. Record at 417. This
time, Nurse Elsy included a note stating that he had seen Mr.
Moore on March 3, April 19, August 30, as well as November 22 of
2010. Record at 417. There are no accompanying prescription

records or treatment notes from any of the visits to Fantus,
except for the one relating to the April 14 visit noted above.

Despite this new evidence, the Appeals Council denied
review. Thereafter, Mr. Moore filed a lawsuit in this Court,
seeking review of the Social Security Administration's final
agency decision. The parties consented to proceed before a
United States Magistrate Judge, and the case was reassigned to
this Court on August 29, 2011. The case is now before the Court
on cross motions for summary judgment: Mr. Moore asks the Court
to reverse the Commissioner's decision denying him benefits, or
to remand the matter for further proceedings; the Commissioner
seeks summary judgment affirming the agency's decision.

DISCUSSION

<u>Applicable Law</u>

An individual claiming a need for DBI or SSI must prove that
he has a disability under the terms of the SSA. In determining
whether an individual is eligible for benefits, the social
security regulations require a sequential five step analysis.
First, the ALJ must determine if the claimant is currently
employed; second, a determination must be made as to whether the
claimant has a severe impairment; third, the ALJ must determine
if the impairment meets or equals one of the impairments listed
by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1;
fourth, the ALJ must determine the claimant's RFC, and must

24

evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not, "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that

the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

<u>Analysis of Mr. Moore's Arguments</u>

Mr. Moore argues that the ALJ's decision should be reversed or remanded because: (1) the ALJ failed to fully develop the record with regard to Mr. Moore's Section 12.00 claims, (2) the ALJ failed to address Mr. Moore's Section 1.08 and 4.00 claims (3) the ALJ's finding that Mr. Moore is capable of a broad range of daily activities is unsupported by the record, (4) the ALJ's proposed RFC is not supported by the record, (5) the ALJ improperly determined that Mr. Moore was not a credible witness, and (6) the ALJ's hypotheticals posed to the Vocational Expert were improper.

    1.   <u>The ALJ's Development of the Record</u>

Mr. Moore first argues that the ALJ failed to develop fully the record and failed to obtain additional information needed to assess his credibility regarding his Section 12.00 claims, specifically, Listings 12.02, 12.04, 12.06, and 12.09. "While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair

record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). To fulfill this duty, an ALJ must "make a 'reasonable effort' to ensure that the claimant's record contains, at a minimum, enough information to assess the claimant's RFC and to make a disability determination." *Martin v. Astrue*, 345 Fed. Appx. 197, 201 (7th Cir. 2009). If the ALJ fails to do so, the Court will remand "so long as the claimant also shows he was prejudiced by the failure." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

The records in this case consists of Mr. Moore's several visits to the emergency room, his medical records while incarcerated in 2007, and several examinations performed by the state agency when he applied for SSI/DIB benefits, as well as his testimony at the hearing. The cases Mr. Moore cites in support of his theory involve *pro se* plaintiffs and records less developed than the record in this case. Having said that, the Court notes that there are, however, some puzzling issues in this case.

First, from the existing record, the Court is unable to determine when Mr. Moore was diagnosed with depression, or why. These records show that, during his incarceration, Mr. Moore reported taking medications for depression, including Prozac and Trazodone, yet the records do not show a thorough diagnostic examination explaining the need for these medications; nor do they explain the nature or severity of Mr. Moore's symptoms. Nor

are there records showing any period of psychiatric hospitalization or even any inpatient course of treatment.  Even the ME was left questioning the severity of Mr. Moore's psychiatric symptoms.  Without a complete picture of what led to Mr. Moore's initial diagnosis of depression, or the observations of a treating physician, the ALJ had a difficult task to determine if Mr. Moore's depression was disabling.

Ordinarily, "a claimant represented by counsel is presumed to have made his best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).  However, in this case, during the administrative hearing, the ALJ offered to try to obtain records of Mr. Moore's psychiatric treatment at Stroger Hospital for him. Record at 79.  For some reason, the ALJ did not receive those records by the time he issued his decision, but Mr. Moore was able to supply them to the Appeals Council a month later.  Though unexplained, the fact that the ALJ took responsibility for obtaining the medical records would make it woefully unfair to shut the door on Mr. Moore for failing to obtain the records himself.  The real question is: what do those records prove?

Mr. Moore claims he is disabled under Listing 12.02 (organic mental disorders), Listing 12.04 (affective disorders), Listing 12.06 (Anxiety-related disorders) and Listing 12.09 (Substance addiction disorders).  In the ALJ's Step 3 analysis, he notes that "despite the claimant's report of history of depression, there is no ongoing evidence of treatment for this condition." Record at 12.  His

diagnosis of "major depressive disorder" does appear more severe than treatment records indicate. However, the new evidence shows that Mr. Moore made two additional visits to Stroger Hospital complaining of depression during the period in question, and on the second of these visits, his diagnosis was affirmed and his medications were increased. The ALJ himself even noted in the administrative hearing that the additional psychiatric treatment records from Stroger might be necessary to "pin . . . down a little more" the severity of Mr. Moore's depression and post-traumatic stress disorder. Record at 63-64. These records show that there was some additional treatment, though the Court cannot say for certain that they would have made a difference in the ALJ's analysis. In fairness though, this is a question for the ALJ and the Commissioner to answer in the first instance. The records should be considered on remand, and, if necessary, additional evidence may even be obtained so that the ALJ can determine whether Mr. Moore's mental impairments are, in fact, disabling within the meaning of the Act.

To be sure, the only fault the Court finds in the ALJ's consideration of this case is his failure to obtain - or explain his failure to obtain - the additional records concerning Mr. Moore's psychiatric treatment. Having taken it upon himself to obtain those records, this failure - unexplained in the record - is cause for remand.

2. Listing 1.08 and 4.00 claims

Mr. Moore next argues that the ALJ committed reversible error by failing to address whether Mr. Moore's impairment met Listings 1.08 and 4.00. The applicant must satisfy all of the criteria of a Listing in order to receive an award of disability insurance benefits and supplemental security income under step three. *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999). The plaintiff bears the burden, in a social security disability benefits case, of proving that his impairment meets a listing. 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00 et seq. Listing 1.08 involves soft tissue injury (e.g. burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage and restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. 20 C.F.R. Pr. 404, Subpt. P, App. 1 § 1.08. Mr. Moore provided no evidence that any soft tissue injuries he might have sustained from his 1987 gunshot wound have been under continuing surgical management. Nor does the record indicate that Mr. Moore had suffered or received treatment for any new soft tissue injuries. Because there is no evidence to suggest that Mr. Moore's impairments satisfy Listing 1.08, the ALJ was not required to discuss it.

30

Listing 4.00 involves the cardiovascular system. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00. The record shows that Mr. Moore complained of chest pain while in custody at Shawnee in 2007, has chest scarring, chronic pain, and "atypical chest pain." Record at 269. His aorta shows minimal prominence and has atherosclerotic calcification. Record at 269. On remand, the ALJ should consider including a discussion of the evidence provided in the record regarding this claim.

3. <u>Daily Activities</u>

Mr. Moore also argues that the testimony at oral hearing does not support the finding that he is capable of a broad range of daily activities that would preclude a Section 12.00 listing, and that the ALJ should have developed his testimony further. The Court views the record as a whole but does not reweigh the evidence or substitute its judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). Mr. Moore argues that he never testified to traveling alone on public transportation, never testified that he cooks "routinely," his testimony indicates that he only occasionally cleans the kitchen with assistance, and that he essentially goes along for the ride to the grocery store while his fiancé shops. However, on this Court's review of the record, he did testify to doing all of those things at least occasionally; he also never testified specifically that he could not do any of those things.

Therefore, the ALJ's finding that Mr. Moore is capable of a wide range of daily activities is supported by substantial evidence.

### 4. The ALJ's RFC Determination

The ALJ found that Mr. Moore had the following RFC: occasionally lift/carry 20 pounds, lift 10 pounds frequently, sit 6 hours and stand/walk 6 hours in an 8-hour workday, occasionally climb stairs, ramps, ladders, ropes, and scaffolds, occasionally stoop, squat, crouch, kneel, crawl, and balance, and simple, routine unskilled work. Record at 12.

Mr. Moore argues that the ALJ's RFC determination was not supported by evidence in the record because the ALJ asked only introductory questions regarding his daily activities, and did not ask specific questions about how Mr. Moore's disability affects his daily activities. However, the ALJ did ask Mr. Moore at the end of questioning whether there was anything they did not cover which he would like to add to his testimony. He answered that there was not. Moreover, Mr. Moore was represented at the hearing by counsel, who could have asked to clarify any point needing it at the time. The ALJ's questioning of Mr. Moore was adequate to ascertain his daily activities, and the Court will not remand on this basis.

Next, Mr. Moore argues that the majority of the ALJ's proposed RFC is not supported by the medical evidence. The regulations provide that a claimant's RFC is assessed "based on

all of the relevant medical and other evidence" of record. Substantial evidence supports the RFC determination. The ALJ's physical RFC was supported by Dr. Jiminez and Dr. Kim's opinions in their RFC assessments that Mr. Moore had no exertional limitations and was limited to no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Record at 300-06. In fact, taking the medical records into account together with Mr. Moore's testimony, the ALJ reduced the claimant to light exertion in his RFC determination. The ALJ explained his reduction of the RFC based upon the positive findings on diagnostic test, as well as reduced range of motion of lumbar spine, decreased sensation over the right lower extremity and difficulty squatting and heel walking. Record at 18. The claimant was limited to simple, routine unskilled work to address any difficulty with memory, concentration, and persistence. Record at 18.

The ALJ's mental RFC finding was supported by Dr. Hermsmeyer's Psychiatric Review Technique assessment, in which he found that Mr. Moore did suffer from Listing 12.02, 12.04, 12.06, and 12.09 disorders, but that he was only mildly limited in his activities of daily living, moderately limited in maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace, but otherwise was not limited. Record at 317. Dr. Hermsmeyer further opined that "the

claimant retains the mental capacity to perform simple on and two-step task at a consistent pace," which is consistent with the ALJ's RFC determination that he would have the capacity to perform unskilled, repetitive work. Record at 319. Dr. Marquis's testimony further reinforced that Mr. Moore has the mental RFC to perform unskilled, repetitive work. Record at 17-18, 65. Having said this, the mental RFC may need to be revisited, depending on what happens on remand.

5.    The ALJ's Credibility Determination

Mr. Moore argues that the ALJ improperly determined that he was not a credible witness and was capable of light exertion. Because the ALJ is "in the best position to determine a witness's truthfulness and forthrightness ... this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.' " *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir.2004) (quotations omitted). When evaluating credibility, the ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (internal quotations omitted). On review, the Court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Mr. Moore first disputes the ALJ's determination that his cane was not medically necessary. He claims that it is irrelevant that he was not prescribed a cane

because the record overwhelmingly indicates his need for a cane. However, as the ALJ points out, Mr. Moore's medical records prior to December 2008 indicate that he did not complain of or exhibit difficulty with normal standing or walking. During his consultative exam with Dr. Biale, he exhibited some difficulty with heel walking and squatting, however, the rest of his movements were unrestricted. Medical records do not indicate that he needed a cane at any time during his incarceration from June 25 to August 12, 2007. There are no treatment notes explaining why Mr. Moore needed a cane when he requested one during his visit to Stroger Hospital on December 18, 2008 "because he is getting old and sometimes needs [a cane]". Record at 14. In fact, the notation references that Mr. Moore was able to walk with no weaknesses of the leg. Moreover, his fiancé's testimony contradicted Mr. Moore's testimony that he used a cane prior to December 2008, as she stated that the claimant has been using a cane only since the end of last year (2008). The Court finds that the ALJ's determination that Mr. Moore's testimony with regard to his need for a cane is not credible was reasonable and supported by substantial evidence.

Secondly, Mr. Moore claims that the ALJ drew inappropriate inferences about his credibility with regard to his mental symptoms and their functional effects based upon his inability to seek ongoing medical care due to lack of finances. The Seventh

Circuit has emphasized that "the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (quoting S.S.R. 96-7p). Because Mr. Moore utilized Stroger Hospital and Provident Hospital of Cook County, both of which are free clinics, for his treatments, it is unclear how Mr. Moore's lack of finances would affect his ability to regularly seek treatment as he now claims. Further, the ALJ considered many other factors in the medical evidence in reaching his conclusion that the plaintiff was overstating the functional effects of his mental symptoms, including Dr. Biale's mental status examination and Dr. Hermsmeyer's mental RFC analysis. Based upon the evidence before him, the ALJ's mental RFC determination was based on substantial evidence. However, as already noted, the issue may need to be revisited on remand.

6. The ALJ's Hypotheticals to the Vocational Expert

Mr. Moore also argues that the ALJ's hypotheticals posed to the vocational expert were improper because the ALJ failed to direct her to consider the hypothetical individual in question using a cane. As a general rule, when the ALJ poses hypothetical questions to the VE, the ALJ must orient the VE to the totality of the claimant's limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). However, "the ALJ is required

only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Similia v. Astrue*, 573 F.3d 503,521 (7th Cir. 2009). The ALJ found that the medical evidence did not support Mr. Moore's representations that he could walk no more than 50 feet without a cane. Because the ALJ was justified in reaching his opinion regarding Mr. Moore's credibility with respect to the cane, the Court also finds that he was not required to include these limitations in his hypotheticals.

CONCLUSION

For the reasons set forth above, the Court finds that this case must be remanded for consideration of the additional evidence regarding Mr. Moore's psychiatric treatment. Accordingly, the Court grants Mr. Moore's Motion for Summary Judgment [#23].

Dated: August 14, 2012

ENTER:

*Arlander Keys*

Arlander Keys
United States Magistrate Judge